Dear Mr. Smith:
Our office received your letter dated May 29, 1991 requesting an evaluation as to the contents of the "Cooperative Endeavor Agreement" between Southeastern Louisiana University (S.L.U.) and the City of Hammond, Louisiana.
After reviewing the Agreement, we have concluded that the contract does not meet the qualifications of a "Cooperative Endeavor Agreement" as defined in Article VII, Section 14(C) of the Louisiana Constitution of 1974 and Title 33, Section 9022 of the Louisiana Revised Statutes. Section 14(C) of the 1974 Constitution provides for entities which may enter into such agreements and reads as follows:
 "(C) Cooperative Endeavors. For a public purpose, the state and its political subdivisions or political corporations may engage in cooperative endeavors with each other, with the United States or its agencies, or with any public or private association, corporation, or individual."
R.S. 33:9022(1) states in pertinent part:
 "`Cooperative endeavors' means any form of economic development assistance between and among the state, its political subdivisions, political corporations, public benefit corporations, the United States or its agencies, or any public or private association, corporation, or individual. The term "cooperative endeavors" shall include but not be limited to cooperative financing, cooperative development, or any other form of cooperative economic development activity."
Although the City of Hammond is a political subdivision of the state, S.L.U. is not in one of the other enumerated classes which may properly enter into a cooperative endeavor as defined under Louisiana law. The term "Cooperative Endeavor Agreement" applies more appropriately to contracts between a political subdivision or public entity and a private entity or corporation, for example. The objective of the agreement usually involves using funds of the state or its political subdivisions together with the funds of a private organization in a combined effort to produce a common goal.
The contract between the City of Hammond and S.L.U. would, however, be classified as a "Cooperative Purchasing Agreement." R.S. 39:1701
defines Cooperative Purchasing as "procurement conducted by or on behalf of more than one public procurement unit or by a public procurement unit with an external procurement activity or by a private procurement unit." Section 1701 defines "Local public procurement unit" as follows:
 "Local public procurement unit" means any parish, city, town, governmental body, and any other subdivision of the state or public agency thereof, public authority, public educational, health, or other institution, and to the extent provided by law, any other entity which expends public funds for the acquisition or leasing of supplies, services, major repairs, and construction, and any nonprofit corporation operating a charitable hospital." (Emphasis supplied.)
Under this provision, S.L.U. as a public educational institution would qualify as a local public procurement unit expending public funds, in conjunction with the City of Hammond, for the construction of a public recreational facility. Therefore, it is the opinion of this office that the proposed contract between S.L.U. and the City of Hammond should be drafted as a "Cooperative Purchasing Agreement" as opposed to a "Cooperative Endeavor Agreement." According to Louisiana law, cooperative purchasing agreements are subject to Louisiana's "Public Bid Law" as defined in R.S. 38:2181, et seq.
Page one of the "Agreement" refers to R.S. 33:1321 entitled "The Local Services Law." Specifically, the agreement states that the contract is agreed upon "under the authority of R.S. 33:1321." The Local Services Law would not be applicable to the contract presented here. This statute is only applicable to parishes, municipalities, or political subdivisions of the state, or any combination thereof who make agreements between or among themselves to engage jointly in the accomplishment or completion of some mutual undertaking. For obvious reasons, reference to this statute would be inappropriate, taking into consideration the parties to the agreement.
As to Section II of the Agreement pertaining to the project's funding, it appears that very little is mentioned regarding specific aspects of the funding. It is our opinion that the applicable grants should be mentioned as well as the amount of expenditures appropriated from each grant to the facility's construction.
Section X of the Agreement lacks explicit language as to the issue of liability. This section could be amended to state that should an action or claim arise based on the negligence of a party to the agreement, then the negligence of one party would not be a basis of liability attributable to the other. Additionally, a clause whereby each party to the agreement renounces the right of indemnity from the other would safeguard one party from the liability attributable to a negligent party.
In addition to the sections already included in the agreement, you may want to consider incorporating other protective measures into the original contract agreement. Some of these provisions include:
 (1) Precedence Clause — This section would state that should there be any conflict between the provisions of the agreement and the attached exhibits or appendices, then the terms and conditions set forth in the agreement shall govern.
 (2) Leasing or Subleasing Clause — Any attempt by either party to the agreement to lease or sublease the facilities would require prior written consent of the non-leasing party to the proposed lease agreement.
 (3) Termination of Agreement Clause — The scope of this section would be directed towards the possibility of one party attempting to withdraw from the agreement once construction has begun. A written and signed agreement to the consequences of such action would place each party on notice before finalization of the agreement.
With regards to the portions of the agreement not mentioned herein, we see no problem with the contents of the sections as they presently exist.
If our office can be of further assistance to you, please do not hesitate to contact us.
Sincerely,
 WILLIAM J. GUSTE, JR. Attorney General
 BY: MARTHA S. HESS Assistant Attorney General